## IN THE DISTRICT COURT OF POTTAWATOMIE COUNTY
## STATE OF OKLAHOMA

(1) CITY OF ADA,
(2) CITY OF ALTUS,
(3) CITY OF ANADARKO,
(4) CITY OF BETHANY,
(5) CITY OF BROKEN ARROW,
(6) CITY OF EDMOND,
(7) CITY OF ELK CITY,
(8) CITY OF ENID,
(9) CITY OF GUTHRIE,
(10) CITY OF JENKS,
(11) CITY OF LAWTON,
(12) CITY OF MIDWEST CITY,
(13) CITY OF MUSTANG,
(14) CITY OF OKLAHOMA CITY,
(15) CITY OF OWASSO,
(16) CITY OF PONCA CITY,
(17) CITY OF SEMINOLE,
(18) CITY OF SHAWNEE,
(19) CITY OF TULSA, and
(20) CITY OF YUKON,

        Plaintiffs,

v.

WALMART INC., f/k/a WAL-MART STORES, INC.,
AND WAL-MART STORES EAST, LP,

        Defendant.

**FILED**
IN THE DISTRICT COURT

JUL 2 8 2022

POTTAWATOMIE COUNTY OK
VALERIE N. UELTZEN, COURT CLERK
BY_____ DEPUTY

Case No. CJ-22-260

### PETITION

### INTRODUCTION

1.      The Plaintiffs, City of Ada, City of Altus, City of Anadarko, City of Bethany, City of Broken Arrow, City of Edmond, City of Elk City, City of Enid, City of Guthrie, City of Jenks, City of Lawton, City of Midwest City, City of Mustang, City of Oklahoma City, City of Owasso, City of Ponca City, City of Seminole, City of Shawnee, City of Tulsa, and City of Yukon (collectively, "Cities" or "Plaintiffs"), bring this action in their own legal capacity to protect the

1

**Exhibit 1**

health, safety, and welfare of all their residents against Walmart Inc. ("Walmart") for its blatant disregard and violation of Oklahoma law.

2.      In 2017, the United States saw a record number of drug overdose deaths, totaling 72,000 people and an approximate ten percent increase from 2016. The 2017 drug overdose death toll is higher than the peak annual death totals for HIV, car wrecks. or gun deaths. Analysts pointed to the opioid epidemic ravaging communities across the country (growing number of opioid users) and prescription opioids becoming deadlier. The opioid epidemic has been particularly devastating to cities across Oklahoma as a result of corporate greed.

3.      Walmart operates more than 5,000 pharmacies nationwide that dispense prescription opioids and other controlled substances. In addition, until 2018, Walmart acted as a wholesale distributor of controlled substances for its own pharmacies.

4.      Walmart has 134 retail units in Oklahoma, including eighty-one (81) Supercenters and thirteen (13) Sam's Clubs, as well as two (2) distribution centers.

5.      As both a pharmacy and a distributor, Walmart had a duty and responsibility at two critical stages in the stream of commerce for opioids. First, in determining whether to fill its pharmacies' wholesale orders for opioids from its distribution warehouses and, second, when deciding whether to fill individuals' prescriptions for opioids. Under Oklahoma law, Walmart had a duty to take steps to prevent the diversion of the prescription opioids it sold.

6.      In fact, Walmart was uniquely well-positioned due to its own distribution channels to prevent the illegal diversion of opioids. Yet, for years, as the opioid epidemic took hold in Oklahoma and rampaged through communities, Walmart failed to do so.

7.      Walmart's actions directly and foreseeably caused damages to Cities, including but not limited to, actual costs, lost opportunity costs, healthcare and emergency care costs, costs for

**Exhibit 1**

social services for those suffering from opioid addiction, overdose, or death; counseling, treatment and rehabilitation services; treatment of infants born with opioid-related medical conditions; welfare and foster care for children whose parents suffer from opioid-related disability or incapacitation; and law enforcement and public safety relating to the opioid epidemic within the Cities. Cities have also suffered substantial damages due to the lost productivity of its residents, increased administrative costs, and the lost opportunity for growth and self-determination. These damages have been suffered and continue to be suffered directly by the Cities.

8.      Cities also seek the abatement of the continuing epidemic created by Walmart's wrongful and/or unlawful conduct.

## II.      THE PARTIES

### A.      Plaintiffs

9.      The Cities are organized cities within the State of Oklahoma, corporate and political bodies with the statutory authority and power to sue and be sued.  Cities provide a wide range of services on behalf of their residents, including but not limited to social services for families and children, public health, public assistance, law enforcement and emergency care. Plaintiffs are referred to as "City" or "Cities".

### B.      Pharmaceutical Walmart

10.      Defendant Walmart Inc., formerly known as Wal-Mart Stores, Inc., is a multinational retail corporation incorporated in the State of Delaware.

11.      Along with retail stores and other business units, Walmart Inc. operates one of the largest pharmacy chains in the United States, consisting of more than 5,000 pharmacies located in Walmart and Sam's Club retail stores in the United States and its territories.  As a pharmacy chain, Walmart Inc. dispenses controlled substances through its agents and employees.

3

**Exhibit 1**

12.     Until 2018, Walmart Inc. also acted as a distributor of controlled substances for its pharmacies around the country.  From 2000 to approximately May 2018, Walmart Inc.  operated at least six distribution centers that distributed controlled substances to its pharmacies  in the United States. The distribution centers were located in Bentonville, Arkansas; Rogers,  Arkansas; Tifton, Georgia; Crawfordsville, Indiana; Hanford, California; and Williamsport,  Maryland.  Collectively, Walmart self-distributed to its pharmacies tens of millions of shipments  of controlled substances.

13.     Upon information and belief as well as publicly available information, Walmart also has two distribution centers in the State of Oklahoma.

14.     Upon information and belief, the distribution centers are registered as Wal-Mart Stores  East, LP.  Wal-Mart Stores East, LP is also incorporated in Delaware.

15.     At all times relevant to this action, Walmart Inc. was responsible for the  compliance of the pharmacies and the distribution centers with all provisions of the OCSA as well as  all pharmacy regulations and common law duties under Oklahoma law.

16.     For ease of reference, Walmart Inc. and Wal-Mart Stores East, LP are  generally referred to herein as "Walmart" except where identification of the particular entity is  significant. In addition, where it is useful to identify the business segment or refer to a brand  (such as "Walmart-branded stores" or "Sam's Club-branded stores"), the distinction between  those business segments or brands is drawn.

### III.     JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action because Walmart conduct business in Cities and throughout Oklahoma and have deliberately engaged in significant acts and omissions within the Cities that have injured their residents. Walmart purposefully directed their activities at

Exhibit 1

Cities, including, but not limited to, marketing, distributing, or selling prescription opioids within Cities.

18.    Venue is proper in Pottawatomie County, State of Oklahoma.

19.    This action is non-removable because there is incomplete diversity of residents, no substantial federal question presented, and a claim for the abatement of a public nuisance in Pottawatomie County based on state law.

## IV.    ADDITIONAL FACTUAL BACKGROUND

### A.    Overview of National Opioid Epidemic

20.    Historically, opioids were considered too addictive and debilitating to be part of a long-term pain management regimen for chronic pain.  Prior to the 1990s, the medical profession adhered to the standard that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer and end-of-life care. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time as well as the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, medical professionals generally did not prescribe opioids for chronic pain.

21.    Moreover, opioids also tend to induce tolerance, whereby a person who uses opioids repeatedly over time no longer responds to the drug as strongly as before, thus requiring a higher dose to achieve the same effect. This tolerance contributes to the high risk of overdose during a relapse for those addicted to opioids.

22.    As described herein, Walmart engaged in conduct that directly caused medical professionals to unwittingly prescribe long-term and increased amounts of opioids to

**Exhibit 1**

"aggressively" treat pain. Walmart did so to take advantage of a much larger and lucrative market for chronic pain patients.

23.     As a result of Walmart' wrongful conduct, prescription opioids have become widely prescribed. By 2010, enough prescription opioids were sold to medicate every adult in the United States with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[1] From 1999 to 2013, the amount of prescription painkillers prescribed and sold in the United States nearly quadrupled. Yet, there had not been an overall change in the amount of pain reported by patients.

24.     By 2011, the U.S. Department of Health and Human Resources, Centers for Disease Control and Prevention ("CDC") declared prescription painkiller overdoses to be at epidemic levels. The press release noted:

    a.  The death toll from overdoses of prescription painkillers has more than tripled in the past decade.

    b.  More than 40 people die every day from overdoses involving narcotic pain relievers like hydrocodone (Vicodin), methadone, oxycodone (OxyContin) and oxymorphone (Opana).

    c.  Overdoses involving prescription painkillers are at epidemic levels and now kill more Americans than heroin and cocaine combined.

    d.  The increased use of prescription painkillers for nonmedical reasons, along with growing sales, has contributed to a large number of overdoses and deaths. In 2010, 1 in every 20 people in the United States age 12 and older—a total of 12 million people—reported using prescription painkillers non-medically, according to the National Survey on Drug Use and Health. Based on the data from the Drug Enforcement Administration, sales of these drugs to pharmacies and health care providers have increased by more than 300 percent since 1999.

---

[1] Katherine M. Keyes et al., *Understanding the Rural-Urban Differences in Nonmedical Prescription Opioid Use and Abuse in the United States*, 104 Am. J. Pub. Health e52 (2014).

**Exhibit 1**

  e. Prescription drug abuse is a silent epidemic that is stealing thousands of lives and tearing apart communities and families across America.

  f. Almost 5,500 people start to misuse prescription painkillers every day.[2]

25. Many Americans, including residents of the Cities, are now addicted to prescription opioids and the number of deaths due to prescription opioid overdose has reached epidemic levels. In 2016, drug overdoses killed roughly 64,000 people in the United States, an increase of more than 22 percent over the 52,404 drug deaths recorded the previous year.[3] The President of the United States has declared the opioid epidemic a public health emergency.

26. The National Institute on Drug Abuse identifies addiction to opioids as "a serious national crisis that affects public health as well as social and economic welfare."[4] The economic burden of prescription opioid misuse alone is hundreds of billions of dollars a year, including the costs of healthcare, lost productivity, addiction treatment and criminal justice expenditures.[5]

27. Deaths from prescription opioids have quadrupled in the past 20 years and treatment admission and emergency room visits related to the abuse of opioids for non-medical use have also dramatically increased.

---

[2] *See* Press Release, Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011), https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html.

[3] *See* Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Provisional Counts of Drug Overdose Deaths, (August 8, 2016), https://www.cdc.gov/nchs/data/health_policy/monthly-drug-overdose-death- estimates.pdf.

[4] Opioid Crisis, NIH, National Institute on Drug Abuse (available at https://www.drugabuse.gov/drugs- abuse/opioids/opioid-crisis, last visited Sept. 19, 2017) ("Opioid Crisis, NIH") (citing at note 1 Rudd RA, Seth P, David F, Scholl L, Increases in Drug and Opioid-Involved Overdose Deaths — United States, 2010–2015, *MMWR MORB MORTAL WKLY REP.* 2016;65, doi:10.15585/mmwr.mm655051e1).

[5] *Id.* (citing at note 2 Florence CS, Zhou C, Luo F, Xu L, The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States, 2013, *MED CARE* 2016;54(10):901-906, doi:10.1097/MLR.0000000000000625).

Exhibit 1

28.     According to the CDC,[6] opioid deaths and treatment admissions are tied to opioid sales.

29.     Walmart have continued their wrongful and unlawful conduct, despite their knowledge that such conduct is causing and continuing to cause the opioid epidemic.

**B.     Overview of Opioid Epidemic in Oklahoma and the Cities**

30.     Communities have been devastated by the opioid epidemic as a result of Walmart's deceptive marketing and distribution/diversion of opioids. Oklahoma is one of the leading states in prescription painkiller sales per capita, with 128 painkiller prescriptions dispensed per 100 people in 2012. Drug overdose deaths in Oklahoma increased eightfold from 1999 to 2012, surpassing car crash deaths in 2009. In 2012, Oklahoma had the fifth-highest unintentional poisoning death rate and prescription opioids contributed to the majority of these deaths.

31.     In 2014, Oklahoma's unintentional poisoning rate was 107% higher than the national rate.  Oklahoma had the 10th highest drug overdose death rate in the nation in 2014. Opioids are the most common class of drug involved in unintentional overdose deaths in Oklahoma.

32.     In 2015, 823 fatal drug overdoses occurred in Oklahoma, an almost 140% increase over 2001, with opioids contributing to the largest number of these deaths. As of 2015, there were more prescription drug overdose deaths each year in Oklahoma than overdose deaths from alcohol and all illegal drugs combined.

---

[6] U.S. Dep't of Health & Human Servs., *Addressing Prescription Drug Abuse in the United States*, available at https://www.cdc.gov/drugoverdose/pdf/hhs_prescription_drug_abuse_report_09.2013.pdf.

8

**Exhibit 1**

33.     In Oklahoma, more overdose deaths involved hydrocodone or oxycodone than methamphetamines, heroin, and cocaine combined.

34.     According to 2016 statistics, Oklahoma ranks number one in the nation in milligrams of opioids distributed per adult resident with approximately 877 milligrams of opioids distributed per adult resident.

35.     A National Survey on Drug Use and Health revealed Oklahoma leads the nation in non-medical use of painkillers, with nearly 5% of the population aged 12 and older abusing or misusing painkillers.

36.     The Cities now carry Naloxone and/or Narcan, antidotes to opioid overdose, and use them virtually on a daily basis to save the lives of the Cities' residents.

37.     Walmart's saturation of communities with prescription opioids has created accessibility and availability of prescription opioids, which is fueling illicit opioid addiction. According to the CDC, past misuse of prescription opioids is the strongest risk factor for a person starting and using heroin. Between 2000 and 2014, the number of overdose deaths from heroin nationwide quintupled.

38.     Walmart's conduct is affecting even the Cities' youngest and most vulnerable citizens. The national rate of babies born with neonatal abstinence syndrome ("NAS"), a group of conditions newborns experience when withdrawing from exposure to drugs like opioids, increased fivefold from 2000 to 2012. In 2014, the number of newborns testing positive for prescription medications doubled the number reported in 2013.

**Exhibit 1**

C.      **Walmart's Unlawful Distribution and Dispensing of Opioids**

39.      In addition to common law duties to exercise reasonable care under the circumstances,[7] Walmart owes a duty under state law to monitor, detect, investigate, refuse to fill, and report suspicious orders of prescription opioids originating from Oklahoma cities as well as those orders which Walmart knew or should have known were likely to be diverted into Oklahoma cities. *See* 63 O.S. Chapter 2 (Oklahoma Uniform Controlled Dangerous Substances Act, hereinafter "Oklahoma CSA" or "OCSA").

40.      The Oklahoma CSA creates a legal framework for the distribution and dispensing of opioids in Oklahoma. It is a system of checks and balances throughout the entire supply chain of opioids and requires every person or entity that manufactures, distributes, or dispenses opioids to obtain "registration" with the Director of the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control. Registrants at every level of the supply chain must fulfill their obligations under the Oklahoma CSA; otherwise, there is an overwhelming risk of harm to Oklahoma cities.

41.      Registrants agree to comply with the OCSA and its implementing regulations, and may manufacture, distribute, prescribe, or dispense controlled substances only to the extent authorized by their registration and the law.

42.      Pursuant to the Oklahoma CSA and the Oklahoma Administrative Code, all opioid distributors are required to maintain effective controls against opioid diversion. Walmart must create and use a system to identify and report downstream suspicious orders of controlled substances to law enforcement. Suspicious orders can include orders of unusual size, orders that

---

[7] This includes a duty not to create a foreseeable risk of harm to others, but also a duty to exercise reasonable care to prevent threatened harm after engaging in affirmative conduct and either realizing or should realize that such conduct has created an unreasonable risk of harm to another.

**Exhibit 1**

deviate from usual ordering patterns, and/or unusual frequency of orders. Thus, at a minimum to comply with these requirements, Walmart must know their customers, report suspicious orders, conduct due diligence, and terminate orders if there are indications of potential diversion.

43.     Oklahoma law also creates a distribution monitoring system for controlled substances and requires distributor and dispensers of controlled dangerous substances to keep records and maintain inventories.

44.     Similarly, the Oklahoma administrative code requires anyone who distributes or dispenses prescription opioids to inform the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control of suspicious orders when discovered. The code also requires reporting of theft or any significant loss of any controlled dangerous substances upon discovery of such theft or loss.

45.     From 2000 to approximately May 2018, Walmart self-distributed tens of millions of shipments of controlled substances to Walmart-branded and Sam's Club-branded pharmacies.

46.     Throughout the period from 2012 to 2018, Walmart was the largest self-distributor in the country for oxycodone, hydromorphone, and hydrocodone in terms of both dosage units and grams.

47.     Because Walmart acted as its own distributor, it had access to extensive data and other information that independent distributors would not ordinarily have.

48.     In particular, Walmart had a wealth of dispensing information that gave it the ability to investigate the circumstances underlying orders for controlled substances. Walmart had data about individuals who filled controlled-substance prescriptions at its pharmacies, the identities of the medical providers who were prescribing controlled substances for those individuals, and reports from its own pharmacists raising concerns.

**Exhibit 1**

49.     Walmart had access to additional data and other information that it could have used to inform its decision as to whether an order was suspicious or not, including but not limited to:

    a.  instances in which a pharmacist had refused to fill prescriptions written by particular prescribers;

    b.  knowledge of "pill mill" prescribers whose patients filled prescriptions at Walmart pharmacies and the specific controlled substances that they often unlawfully prescribed to patients;

    c.  knowledge of Walmart's own pharmacists, pharmacy managers, and market directors;

    d.  the distance between prescribers, patients, and pharmacies;

    e.  information concerning patients who paid cash for controlled-substance prescriptions;

    f.  drug diversion trends.

50.     Walmart also had access to distribution-related data and other information, including but not limited to:

    a.  the number of bottles of controlled substances that each of its pharmacies had already ordered in any given week;

    b.  historical order quantities and patterns;

    c.  order and shipment history for orders that Walmart pharmacies placed with independent distributors (*e.g.,* McKesson Corporation and AmerisourceBergen Corporation), including reports warning when a pharmacy was nearing an independent distributor's threshold and information about instances when an independent distributor had refused to ship the order and reported the order to

**Exhibit 1**

DEA as suspicious;

    d.  orders that had been previously flagged for its pharmacies;

    e.  analytics concerning each pharmacy's ratio of controlled-substance purchases to non-controlled-substance purchases;

    f.  previous suspicious-order reports for its pharmacies; and

    g.  prior and current suspicious order monitoring ("SOM") remediation plans, discussed below, for its pharmacies.

51.    In addition to the data and other information it had about its own distribution and dispensing, Walmart also had access to data and other information about the millions of orders shipped from independent distributors.

52.    Although Walmart has emphasized that it relies on "big data", it chose not to do so in the context of suspicious orders and preventing diversion of the opioids it was distributing and dispensing.

53.    Both before and during the Distribution Violations Period, Walmart's SOM program contained significant defects that prevented Walmart from detecting and reporting at least hundreds of thousands of suspicious orders that its pharmacies placed with its distribution centers.

54.    Numerous internal documents demonstrate that Walmart knew throughout this period of significant defects with its SOM program. For example, Walmart's SOM system focused exclusively on the size of orders.  It contained no processes to detect or report orders with unusual frequency or unusual pattern.

55.    During the Distribution Violations Period, Walmart's SOM program—including the systems, policies, and procedures that Walmart employed to monitor suspicious orders—changed and went through multiple iterations.

**Exhibit 1**

56.     During the Distribution Violations Period, most of Walmart's six distribution centers used a system called Reddwerks as their order fulfillment system. Reddwerks tracked orders placed by Walmart pharmacies, as well as shipments from Walmart distribution centers back to the pharmacies in fulfillment of those orders.

57.     Although the Reddwerks system was not designed for monitoring suspicious orders, Walmart used it for that purpose. Specifically, Walmart used Reddwerks to set "order alerts"—sometimes known as "thresholds"—that would flag only orders over a certain quantity.

58.     Despite Walmart's sole focus on order size, its monitoring still failed to detect significant numbers of orders of "unusual size." Moreover, Walmart recognized and knew that the SOM program had an additional, critical shortcoming: Walmart-branded pharmacies and Sam's Club-branded pharmacies ordered and received at least hundreds of thousands of shipments of controlled substances from McKesson and AmerisourceBergen, respectively, but Walmart did not factor in these shipments from independent distributors when considering whether the pharmacies had exceeded order-size thresholds and hard limits.

59.     In addition to altogether failing to detect orders of unusual frequency or pattern and failing to adequately detect orders of unusual size, Walmart's SOM program also ignored signs that diversion was occurring at certain pharmacies. Walmart routinely shipped, and did not report, orders exceeding its hard limit for oxycodone 30 mg.

60.     Walmart's failure to detect and report suspicious orders not only violated the law, but also inhibited Walmart's ability to timely investigate the suspicious orders and uncover potentially unlawful conduct. If Walmart had complied with its obligation to detect and report suspicious orders, it would have investigated the reasons for those orders and initiated remediation plans.  It  thus could have taken steps that might have led to the timely detection of unlawful,

**Exhibit 1**

improper, or dangerous conduct. For example, Walmart could have discovered that the unusually high demand for a controlled substance at a particular pharmacy was resulting from dispensing at that pharmacy for a "pill mill" prescriber.

61.     In addition to Walmart's wholesale distribution of opioids, Walmart is in control of the last step of the "closed" distribution system in that its own pharmacies, after being presented with a prescription, dispense prescription opioids to the end user. Under Oklahoma law, physicians and other medical providers who register and comply with the OCSA, in good faith and in the course of such person's professional practice only, may prescribe and administer controlled dangerous substances. 63 O.S. § 2-312.

62.     In addition to the duties under OCSA, the dispensing of opioids is also governed by the Oklahoma Pharmacy Act ("OPA") is designed to "promote, preserve and protect the public health, safety and welfare by and through the effective control and regulation of the practice of pharmacy and of the registration of drug outlets engaged in the manufacture, production, sale and distribution of dangerous drugs, medication, devices and such other materials as may be used in the diagnosis and treatment of injury, illness and disease". 59 O.S § 353.

63.     Among the most important duties of a pharmacist, is the duty to determined that a prescription is valid and issued by a medical practitioner with the ability and licensure to issue a prescription as well as determine that the prescription is for a legitimate medical purpose and adhere to the usual course of business in filling or not filling the prescription. 59 O.S § 353-366.

64.     The foreseeable harm from a breach of these duties is the diversion of prescription opioids for nonmedical purposes.

**Exhibit 1**

65.     Walmart repeatedly and purposefully breached its duties under common law and state law. Such breaches are direct and proximate causes of the widespread diversion of prescription opioids for nonmedical purposes into Oklahoma cities.

66.     In particular, Walmart has violated the OCSA, Oklahoma Administrative Code, and OPA on a far-reaching scale, filling enormous numbers of invalid opioid prescriptions.

67.     These numerous, widespread violations were the inevitable result of Walmart's failure to take seriously its duty to comply with its obligations, and Walmart's own directives that made it difficult for its pharmacists to fulfill compliance obligations. Walmart pressured its pharmacists to fill prescriptions as fast as possible, leaving them little time to take the steps needed to determine whether controlled-substance prescriptions were valid. While Walmart compiled "red-flag" information about problem prescribers, it did not alert its pharmacists to this information, even though they needed that information to determine whether prescriptions were valid. Walmart also deprived its pharmacists of the tools and support they needed in order to comply with their dispensing

68.     Walmart knew that many controlled-substance prescriptions it filled were not issued for a legitimate medical purpose, or were not issued in the usual course of professional medical practice, or both. Walmart, through its agents and employees, gained this knowledge in a number of ways.

69.     First, on many occasions, Walmart filled prescriptions written by prescribers its own pharmacists repeatedly had identified as problem or even "pill-mill" prescribers. Pharmacists identified specific red flags that they had found unresolvable, and that had led them to refuse to fill prescriptions as invalid and to distrust any prescriptions written by the prescribers. Pharmacists reported these pill-mill prescribers through "refusal-to-fill" forms and other direct communications

**Exhibit 1**

that they submitted to Walmart's compliance unit, which operated from the company's Home Office and oversaw nationwide dispensing operations. Walmart's compliance unit managers collected and compiled this red-flag information but then chose not to alert other pharmacists to this red-flag information for their use in assessing the validity of prescriptions.

70.     Second, on their face, certain prescriptions presented obvious red flags relating to the amount, dose, or combination of drugs prescribed, or the prescribing patterns. These prescriptions and some were a "cocktail" mix of opioids that were so dangerous, and so indicative of prescription drug abuse or other diversion, that Walmart pharmacists would have known the prescriptions had a very high probability of invalidity.

71.     All told, from June 2013 forward, Walmart pharmacists filled thousands of prescriptions comprising these dangerous combinations, many of which presented additional red flags of abuse or other diversion. Hundreds of them, for instance, were paid for in cash, and hundreds more were dispensed to patients who were from a different state than the prescriber and/or pharmacy.

72.     Third, on some occasions, a Walmart pharmacist would determine that a prescription was invalid based on the presence of obvious, unresolved red flags and refuse to fill it. Then another Walmart pharmacist—presented with the same or similar red flags—would fill the prescription or a similar one for the same patient, under circumstances indicating that the pharmacist had recognized the red flags but filled the prescription without resolving them.

73.     From these unresolved red flags, Walmart became aware that it was routinely being asked to fill prescriptions that were not issued for a legitimate medical purpose and/or that were written by prescribers not acting in the usual course of their professional practice. Walmart filled numerous controlled-substance prescriptions despite the obvious red flags, Walmart pharmacists

**Exhibit 1**

failed to comply with their own professional pharmacy practice standards. In many instances they failed to resolve the red flags, and, upon information and belief, also failed to document any resolution of the red flags.

74.     The unlawful diversion of prescription opioids is a direct and proximate cause of the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality in the Cities. This diversion and the epidemic are direct causes of harms for which Plaintiffs seek to recover here.

75.     The opioid epidemic in the Cities remains an immediate *hazard to public health and safety*.

76.     Walmart intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

## V.     CAUSES OF ACTION

### A.     Public Nuisance

77.     Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

78.     Walmart, individually and acting through their employees and agents, has intentionally, recklessly, or negligently engaged in conduct or omissions which endanger or injury the property, health, safety and/or comfort of a considerable number of persons in the Cities by their production, promotion, and marketing of opioids for use by residents of the Cities.

79.     Walmart's misrepresentations and omissions regarding opioids, as set forth above, has created an opioid addiction epidemic in the Cities that constitutes a public nuisance. Walmart has created a condition that affects entire communities, neighborhoods, and considerable

**Exhibit 1**

numbers of persons at the same time.

80.     Walmart's misrepresentations and omissions regarding opioids constitute unlawful acts and/or omissions of duties, which annoy, injure, or endanger the comfort, repose, health, and/or safety of others, and offend decency to a considerable number of persons in the Cities. It has even caused deaths, serious injuries, and a severe disruption of public peace, order and safety.

81.     Walmart has a duty to abate the nuisance caused by the prescription opioid epidemic.

82.     Walmart has failed to abate the nuisance they created.

83.     Walmart's conduct directly and proximately caused injury to Plaintiffs and their residents.

84.     As a direct result of Walmart's conduct, the Cities have suffered actual injury and economic damages including, but not limited to, significant expenses for police, emergency, health, prosecution, social services and other services, lost tax revenue, as well as injury and death of residents of the Cities.

85.     Walmart is liable to the Cities for the costs borne by it as a result of the opioid epidemic and for the costs of abating the nuisance created by Walmart.

**B.     Fraud: Actual and Constructive**

86.     Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

87.     Walmart, individually and acting through their employees and agents, made misrepresentations and concealed facts material to Plaintiffs and their residents to induce them to purchase, administer, and consume opioids as set forth in detail above.

19

**Exhibit 1**

88.     Walmart knew at the time that they made their misrepresentations that they were false, made recklessly without knowledge of the truth, and/or had no reasonable ground for believing such assertions. Namely, Walmart knowingly and/or recklessly:

    a. Refused or negligently failed to report suspicious orders;

    b. Refused or negligently failed to adhere to the usual course of the professional practice of pharmacy in filling prescription of opioids; and

    c. Knowingly dispensed opioids pursuant to prescriptions that were either not issued in the usual course of professional treatment, not for a legitimate medical purpose, or both. .

89.     Walmart intended that Plaintiffs and their residents would rely on their misrepresentations regarding the risks, efficacy, and medical necessity of their opioids, to increase the number of opioid prescriptions and users within the Cities.

90.     Plaintiffs and their residents reasonably relied upon Walmart' misrepresentations, and that Walmart would not conceal material facts.

91.     Walmart is liable to Plaintiffs for its actual fraud.

92.     Walmart had a legal and/or equitable duty to disclose the dangerous and addictive nature of opioids and prevent their diversion. Instead, Walmart mislead the medical community and the residents of the Cities and flooded the market with its dangerous drugs.

93.     Walmart's conduct constitutes constructive fraud for which Walmart is liable to Plaintiffs.

94.     As a result of Walmart's actual and constructive fraud, the Cities have suffered actual damages, including but not limited to, significant costs related to healthcare, undermining

**Exhibit 1**

of the economic productivity of its residents, and the harming of the long-term health and welfare of the people of the Cities.

95.     Walmart's repeated and continuing conduct was willful, wanton, and malicious and was directed at the public generally. As a result, the Cities seek to recover punitive damages against Walmart.

### C.     Negligence and Negligent Misrepresentation

96.     Plaintiffs incorporates the allegations set forth above as if they were fully set forth herein.

97.     Walmart had a legal duty to act with the exercise of ordinary care or skill to prevent injury to another.

98.     Walmart breached this duty through its failure to divert opioids from illicit channels. Walmart knew of the highly addictive nature and dangers of prescription opioids and the potential of diversion as a result. Yet, Walmart refused or negligently failed to report, prevent, or halt suspicious orders as well as dispensing opioids based on prescriptions not in the usual course of the professional treatment, not for a legitimate medical purpose, or both.

99.     Walmart's repeated and continuing breach of its duty of care directly and proximately caused damage to the Cities.

### D.     Punitive Damages

100.    Plaintiffs incorporate the allegations set forth above as if they were fully set forth herein.

101.    Walmart acted with malice, purposely, and intentionally.  At a minimum, Walmart engaged in the conduct alleged herein with a conscious disregard for the rights and safety of other persons, even though that conduct had a great probability of causing substantial harm.

**Exhibit 1**

102.    Plaintiffs are entitled to punitive damages in addition to actual damages from Walmart.

## JURY TRIAL DEMAND

103.    Plaintiffs hereby request a trial by jury.

## RELIEF

**WHEREFORE,** Plaintiffs respectfully pray that this Court grant the following relief:

1.     Enter Judgment in favor of Plaintiffs against Defendant awarding Plaintiffs their actual damages for the damages caused by the opioid epidemic, including but not limited to: (1) costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs for providing treatment, counseling, and rehabilitation services; (3) costs for providing treatment of infants born with opioid-related medical conditions; (4) costs for providing care for children whose parents suffer from opioid-related disability or incapacitation; (5) costs associated with law enforcement and public safety relating to the opioid epidemic; and (6) costs associated with drug court and other resources expended through the judicial system.

2.     Order Defendant to compensate Plaintiffs for past and future costs to abate the ongoing public nuisance caused by the opioid epidemic;

3.     Order Defendant to fund an "abatement fund" for the purposes of abating the opioid nuisance;

4.     Enter judgment against Defendant requiring Defendant to pay punitive damages;

5.     Enter judgment against Defendant awarding Plaintiffs reasonable attorneys' fees, all costs and expenses, pre-judgment and post-judgment interest; and,

6.     All other such and further relief as this Court may deem just and proper.

**Exhibit 1**

Respectfully submitted,

_____
MATTHEW J. SILL, OBA #21547
HARRISON C. LUJAN, OBA #30154
FULMER SILL, PLLC
1101 N. Broadway Ave., Suite 102
Oklahoma City, OK 73103
Phone: 405-510-0077
Fax: 800-978-1345
msill@fulmersill.com
hlujan@fulmersill.com

*Attorneys for Plaintiffs*

**Exhibit 1**